AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

2:23mj1008 DAO

KOMITEE, J.

POLLAK, M.J.

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Braden John Karony | ) Case No.  23-CR |
| | ) |
| | ) |
| | ) |
| Defendant | ) |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Braden John Karony ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

15 U.S.C. §§ 78j, 78ff and 18 U.S.C. § 371 (securities fraud conspiracy); 18 U.S.C. § 1349 (wire fraud conspiracy); and 18 U.S.C. § 1956(h) (money laundering conspiracy)

Date:    10/31/2023

BRENNA B. MAHONEY

*Issuing officer's signature*

City and state:   Brooklyn, New York

on behalf of F:

*Printed name and title*

| Return | |
|---|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ | |
| at *(city and state)* _____ . | |
| | |
| Date: _____ | _____ |
| | *Arresting officer's signature* |
| | |
| | _____ |
| | *Printed name and title* |

2:23mj1008 DAO

HDM:DGR/MRG/JOE
F. #2021R00923

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BRADEN JOHN KARONY,
    also known as "John Karony" and
    "CPT_HODL_T_MUN,"
KYLE NAGY,
    also known as "Safemoon Dev," and
THOMAS SMITH,
    also known as "papa,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
\*   OCTOBER 31, 2023   \*
BROOKLYN OFFICE

I N D I C T M E N T

Cr. No. __23-CR-433_____
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
  1349, 1956(h) and 3551 et seq.; T. 21,
  U.S.C., § 853(p); T. 28, U.S.C., §
  2461(c))

Judge Eric R. Komitee
Magistrate Judge  Cheryl L. Pollak

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Entities

        1.     SafeMoon US LLC, a limited liability company registered in Utah, together with its subsidiaries and affiliates ("SafeMoon"), held itself out as a technology and blockchain company in operation from March 2021 through June 2023. SafeMoon issued a digital asset called SafeMoon Token ("SFM"), which was first minted, or generated, in or about March 2021.

        2.     The defendant BRADEN JOHN KARONY, also known as "John Karony" and "CPT_HODL_T_MUN," ("KARONY" or "JOHN KARONY") worked for SafeMoon and, at various times, held himself out as the "Chief Executive Officer" of SafeMoon.

3. The defendant KYLE NAGY, also known as "SafeMoon Dev," worked for SafeMoon and was the initial developer of SFM.

4. The defendant THOMAS SMITH, also known as "papa," worked for SafeMoon and held himself out, at various times, as the "Chief Technology Officer" of SafeMoon.

II. Digital Assets and Background of SFM

5. A "digital asset" or "digital token" refers to an asset that is issued and transferred using distributed ledger or blockchain technology. As such, the creation of a digital asset, and transactions in the digital asset, are verified, and records maintained on, a decentralized system using cryptography, rather than through a centralized authority like a bank or government. Like traditional fiat currency, there are various types of digital assets, such as Bitcoin, Ethereum, Litecoin, Tether and other digital assets, including other stablecoins.

6. A "stablecoin" is a type of digital asset the value of which is pegged or tied to that of another currency, commodity or financial instrument. Stablecoins are designed to reduce volatility relative to unpegged digital assets like Bitcoin.

7. Digital assets can be transacted on crypto exchanges, which are platforms hosted by companies or other entities that make it convenient for users to purchase, trade and sell digital assets.

8. SFM was a decentralized finance ("DeFi") digital asset launched in March 2021 that subsequently reached a market capitalization of more than $9 billion dollars. Since its launch, SFM had more than two million SFM holders. SFM, like other digital assets, had its transactions recorded on a public ledger commonly referred to as a "blockchain," which acts as an accounting ledger. Unlike a bank's ledger, a blockchain is distributed across participants of

3

the digital currency's entire network. No company, country or third party is in control of it, and anyone can participate.

9.       At the time of its initial minting, SFM was available on the Binance Smart Chain, which was also referred to as the "BNB Chain." As a result, for every transaction involving SFM minted on the Binance Smart Chain, the BNB Chain recorded, among other things, the date and time of the transaction, the unique digital-asset wallet addresses associated with the transaction and the amount of the digital asset involved in the transaction.

10.      Like other digital assets and tokens, SFM relied, in part, on the operation of smart contracts, which, in plain terms, are computer code operating on a blockchain. Smart contracts are deterministic programs that execute a particular task when and if certain conditions are met.

11.      In digital-asset markets, "liquidity" refers to the ability of a user to convert a digital asset or token into fiat currency or another digital asset or token. If there is liquidity in the market for a particular token, holders of that token can trade it without significantly affecting that token's market price. For illiquid tokens, trades of that token can cause large changes in its market price.

12.      DeFi tokens relied on a type of smart contract known as a "liquidity pool" to supply liquidity to the market for a particular DeFi token. Each liquidity pool is a collection of paired digital tokens (e.g., Token A and Token B), and these collections (or pools), in turn, provide liquidity to traders who want to exchange or swap one of the tokens for the other, e.g., exchanging Token A for Token B or vice versa. Token swaps completed via a liquidity pool are typically managed by a type of smart contract code known as an automated market maker and

not by human operation.  The price of the tokens in a pool is set automatically and is a function of the ratio of the two tokens in the pool.

13.     For certain liquidity pools, the token pairs can be added to the pool by any user who wants to add liquidity.  For each deposit of a token pair, the depositor receives unique "liquidity pool tokens" ("LP tokens") that act as a receipt.  The holder of an LP token can redeem those LP tokens from the liquidity pool.

14.     A user who holds all or even a large proportion of LP tokens can greatly affect the available liquidity in a market, as the user could redeem their LP tokens and thereby remove the corresponding liquidity from the market.  One way to mitigate the risk of liquidity removal is to use smart contracts that can render LP tokens inaccessible to any party in perpetuity or for a specific duration, i.e., as long as the LP tokens are locked, they cannot be used to remove anything from the liquidity pool and reduce the possibility of a "rug pull."

15.     A "rug pull" is a colloquial term used to describe a scheme in which an issuer of digital assets solicits funds from prospective digital asset investors promising them certain benefits, and, once the purchasers' funds are used to purchase the digital asset, the developers abruptly abandon the project and fail to deliver the promised benefits while fraudulently retaining the purchasers' funds.

16.     Like other DeFi tokens, SFM relied on liquidity pools to provide liquidity to the SFM market.  SafeMoon and the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH controlled the SFM liquidity pools, in part, through their control of the underlying SFM smart contracts.  Those SFM smart contracts governed, among other things, how token pair deposits, token pair withdrawals and token trades in the SFM liquidity pools operated.

17.     As described further below, SafeMoon and the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH, together with others, created and/or operated a series of websites and published "white papers" describing SFM's token supply, the properties of SFM tokens and its utility to investors. A digital-asset white paper is understood within the digital asset community to be a comprehensive document outlining the technical and economic aspects of a specific digital asset. As in the case of SafeMoon, white papers are typically authored and/or published by the digital asset's development team or its core members and serve as a guide for investors and potential investors.

18.     Investors who purchased SFM thus relied on the representations and efforts of SafeMoon and the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH to provide liquidity to the market for SFM by controlling the underlying SFM smart contracts that in turn controlled the SFM liquidity pools.

19.     SafeMoon, via the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH, marketed to investors that, through the operation of SFM's smart contracts, transactions in SFM would automatically be subject to a 10% tax, meaning, for example, that if a holder of SFM transferred 10 SFM to another user, 1 SFM would automatically be retained from the transfer as a tax, and the remaining 9 SFM would be received by the other party. The proceeds of SFM's 10% tax were split into two 5% tranches, the proceeds of which were supposed to benefit holders of SFM in specific ways.

20.     The first 5% tranche of the tax proceeds would be "reflected" back to, and distributed among, all SFM holders, in proportion to their current SFM holdings. In effect, through this "reflection," a holder of SFM would see their SFM balance automatically increase each time any user transferred SFM. The remaining 5% tranche of SFM tax proceeds would be

deposited into designated SFM liquidity pools. The larger the SFM liquidity pool, the greater the liquidity in the market for SFM. Through the execution of SFM's smart contracts, half of the SFM tax proceeds (5%) were automatically used to increase the supply of SFM and BNB in the SFM liquidity pools by converting proceeds from the 5% tax into pairs of SFM and BNB that were then deposited into the SFM liquidity pools.

21.     Investors in SFM thus relied on SFM and the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH to ensure that the 10% tax on SFM transactions they had advertised to the marketplace would in fact be assessed and collected for their benefit.

22.     The most commonly used SFM liquidity pools were collections of SFM and another more widely known digital asset, BNB. Using the SFM liquidity pools, a trader could swap SFM for BNB, or vice versa, in a decentralized manner, i.e., without the use of an intermediary like a broker or custodian.

23.     SFM was also marketed to investors as a "deflationary" token, meaning that its circulating supply (or "float") would decrease over time as the developers manually "burned" or destroyed SFM on the blockchain, thereby removing them from the available supply of SFM.

24.     As a result, investors in SFM looked to and relied on the efforts of SFM and the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH to decrease the float of SFM over time, which would, by definition, increase the value of SFM for those investors' benefit.

III.     The Criminal Scheme

A.     Overview

25.     From at least in or about March 2021 through April 2023, the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH, together with others, perpetrated a series of fraudulent schemes to defraud current and prospective SFM investors by making materially false statements and promises concerning SFM, and omitting material information from their statements that rendered them false and misleading.  Among other things, KARONY, NAGY and SMITH represented to investors that SFM relied on "locked" liquidity pools that would automatically increase in size due to the 10% tax on every SFM transaction; that the "locked" SFM liquidity pool prevented KARONY, NAGY, SMITH and other insiders at SafeMoon from being able to "rug pull" SFM investors by removing tokens from the SFM liquidity pool; that tokens in the liquidity pool would not be used to enrich the SafeMoon developers, including KARONY, NAGY and SMITH; that KARONY, NAGY and SMITH would manually add token pairs to the SFM liquidity pool when transactions of SFM occurred on specific centralized exchanges; and that the developers were not holding and trading SFM for their personal benefit.  These representations were materially false.

26.     Contrary to their representations to SFM investors, from their inception, the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH retained access to the SFM liquidity pools and they used that access to intentionally divert millions of dollars' worth of tokens from the SFM liquidity pools for their personal benefit, including to, among other things, purchase luxury vehicles and real estate, and to fund personal investments.  In addition, although they publicly denied that they personally held or traded SFM, KARONY, NAGY and SMITH

repeatedly bought and sold SFM for their personal benefit, including at the height of SFM's market price, which generated millions of dollars in profits.

       B.     The Initial Minting, Marketing and Sale of SFM to Investors and the First
               Fraudulent Removals of Liquidity from SFM's Liquidity Pool

       27.     On or about March 1, 2021, the defendant KYLE NAGY minted one quadrillion SFM tokens on the Binance Smart Chain. As part of the minting process, NAGY received these SFM into a wallet publicly referred to as the "SafeMoon Protocol: Deployer" (the "SFM Deployer Wallet"), which NAGY owned and controlled. After minting SFM, NAGY used a digital-asset offering service to make 777 trillion SFM tokens available for sale to investors beginning on or about March 2, 2021.[1]

       28.     On or about March 2, 2021, the defendant KYLE NAGY caused the initial SFM liquidity pool to be funded with 63 trillion SFM and 61.74 Binance Coin (BNB), which is another digital token native to the Binance blockchain. With this addition of liquidity, an initial set of approximately 1,972 SFM LP tokens were automatically generated and thereafter sent to a separate smart contract.

       29.     Contemporaneous with the minting of SFM, a series of websites and white papers owned and controlled by the defendant KYLE NAGY began marketing SFM to investors and prospective investors, including to prospective SFM investors in the Eastern District of New York. Among other things, these websites and white papers marketed SFM as a "safe" investment because, among its other features, SFM relied on "locked" liquidity pools, which allowed investors to transact in SFM more easily, reduced SFM's price volatility and protected SFM investors from fraudulent "rug pulls" by SFM's developers. A March 2, 2021 post to a

---

[1]     NAGY destroyed the other 223 trillion SFM tokens by "burning" them on the blockchain.

SafeMoon blog created by NAGY specifically highlighted these purported benefits to investors. The post claimed that SFM's smart contracts "would act to auto-magically [sic] transfer a portion of each sale into the LP" where it would be "locked for life." The post also described SFM's 10% tax on transfers to include "5% auto-locked in LP."

30.     On or about March 3, 2021, SafeMoon published an SFM user guide and code for the SFM smart contract. Both cited SFM's purported safety as a digital asset and inability to be fraudulently "rug pulled" by the token's developers. The user guide represented that SFM featured "auto-locking liquidity for 4 years" and was "100% community owned and driven - no rug is possible." The published SFM smart contract code stated that SFM featured a "fee" to "auto add to the liquidity pool to locked [sic] forever when selling [SFM]."

31.     On or about March 2, 2021, investors began purchasing SFM for the first time, with the defendant KYLE NAGY acquiring 3 trillion SFM using the SFM Deployer Wallet. The following day, NAGY acquired an additional 18.9 trillion SFM using the SFM Deployer Wallet.

32.     During this time, as the defendant KYLE NAGY and other investors purchased and transferred SFM, the SFM smart contract applied the 10% tax to every transaction, automatically redistributing half of that tax (5%) to all other SFM holders and adding the other half of that tax (5%) to the SFM liquidity pools. In turn, with each liquidity pool deposit, the SFM Deployer Wallet received new SFM LP tokens. These SFM LP tokens were distinct from the SFM LP tokens NAGY had locked in a separate smart contract on March 2, 2021.

33.     The defendant KYLE NAGY controlled the SFM Deployer Wallet and the SFM LP tokens stored therein. By March 4, 2021, NAGY had accumulated more than 300 SFM

LP tokens. On or about March 5, 2021, NAGY used the accumulated LP tokens to remove approximately 3.59 BNB tokens and 36.6 trillion SFM from the SFM liquidity pool. NAGY then sold 36.9 trillion SFM by swapping those tokens for 1.64 BNB.

34.     As SFM's trading volume increased, the defendant KYLE NAGY continued to use SFM LP tokens to remove liquidity from the SFM liquidity pool. Between March 6, 2021 and March 15, 2021, NAGY used SFM LP tokens to remove approximately 46 trillion SFM and 644.91 BNB from the SFM liquidity pool. Between March 7, 2021 and March 25, 2021, NAGY transferred more than 10 trillion SFM and 440 BNB obtained through liquidity removals to wallets he personally controlled.

C.     March 2021: The Defendants JOHN KARONY and THOMAS SMITH Joined SafeMoon and Marketed SFM to Investors Based on Material Misrepresentations

35.     In or about mid-March 2021, the defendant KYLE NAGY recruited defendants JOHN KARONY and THOMAS SMITH to join the SafeMoon project and they continued marketing SFM directly to investors and prospective investors, including to investors and prospective investors in the Eastern District of New York. KARONY assumed the title of CEO of SafeMoon and SMITH assumed the title of Chief Technology Officer of SafeMoon. After joining, KARONY and SMITH worked to update SafeMoon's public-facing websites and white papers, and communicated with current and prospective SFM investors using, among other things, channels, social media and chat rooms, and livestreamed video SafeMoon "Ask Me Anything" ("AMA") sessions.

36.     Through these public-facing SafeMoon websites, white papers and AMA sessions, the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH promoted SFM as a digital asset that was "safe" in light of its "locked" liquidity pool and would generate returns for SFM investors through its automatic "reflections" and through the developers' own

efforts. Between March 2021 and April 2021, SafeMoon's websites and white papers continued to highlight SFM's "automatically" locked liquidity. They also included "Road Maps" that outlined the steps the developers would purportedly take to increase the value of SFM; these included "marketing & listings" of SFM "on multiple exchanges" and the arranging of "partnerships." These marketing materials linked the appreciation of SFM's price to these efforts, claiming that the developers' efforts would take SFM's price "[t]o the moon."

37.     SFM's trading volume and market capitalization grew rapidly throughout March and April 2021. During this time, in addition to their own promotional efforts, the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH worked to identify and pay celebrities and social media "influencers" with large followings to promote SFM over social media in the hopes that the promotion would increase the trading volume and price of SFM.

38.     The defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH also participated in multiple AMAs throughout March 2021. During these AMAs, KARONY, NAGY and SMITH, together with others, promoted SFM, updated current and prospective SFM investors on their progress on the "road map" and addressed investor concerns about SFM. In response to specific investor questions about SafeMoon insiders' personal SFM holdings and trading activity, KARONY, NAGY and SMITH claimed falsely that they were not personally holding and trading SFM. They represented that NAGY had acquired SFM in the "fair launch" and continued to hold them in a "development wallet" that would be used to fund SafeMoon's development. As SMITH claimed during a March 2021 AMA, "After we've burnt through or gone through all of that, we don't have any [SFM]. We don't have access to anything else."

39.     Although the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH represented to investors that they were not holding or trading SFM for their personal

benefit, those representations were false. By March 13, 2021, NAGY had already liquidated trillions of SFM he obtained from the SFM liquidity pool and transferred the proceeds of those sales to wallets he owned and controlled. At the same time, KARONY, SMITH and other SafeMoon insiders discussed strategies to secretly acquire and sell SafeMoon to enrich themselves.

40.     For example, on or about March 13, 2021, KARONY messaged Co-Conspirator 1, a SafeMoon insider whose identity is known to the Grand Jury, that he "[j]ust bought some SafeMoon" and told Co-Conspirator 1 to ask defendant THOMAS SMITH to "snag you some." The following day, Co-Conspirator 1 asked KARONY, "we can buy SFM? Or nah?" KARONY responded "maybe no." But KARONY explained that they could conceal their SFM holdings and stated: "You can always buy, then transfer 'ownership' to someone . . . . Just have a game plan to transfer it over to someone you trust." Two days later, Co-Conspirator 1 asked KARONY, "How much you holding?," and KARONY responded "tech[n]ically none." Co-Conspirator 1 asked, "How much are you hypothetically holding?" KARONY replied "less than 100."

41.     The defendants JOHN KARONY and THOMAS SMITH also discussed trading strategies designed to allow them to personally profit from SFM's increasing value. In or about March 2021, KARONY told SMITH that each day they should sell $10,000 worth of SFM from the SFM Deployer Wallet. After KARONY noted such sales could generate potential tax liability, he proposed a plan to avoid that liability, explaining to SMITH that they "may need [to] take some of that cash and buy you and [Individual-2] [a] reliable 'company' car as well."[2]

---

[2]     Individual-2, whose identity is known to the Grand Jury, was a close relative of SMITH who did not work for, or hold any position at, SafeMoon.

SMITH responded to KARONY, stating that they needed to "be weary of bank accounts reporting to irs on 9k deposits within a certain period of time" and that "irs would be heavy into audits if we did 9k regularly."

42.     Between March 13, 2021 and March 16, 2021, the defendant KYLE NAGY continued to remove liquidity from the SFM liquidity pools using SFM LP tokens, and he continued to sell those tokens for his personal benefit.  On or about March 16, 2021, NAGY asked defendant JOHN KARONY, "should we be honest with the team about pulling out of the LP for the project now" and noted that he was "getting questions about it."  KARONY responded, "lets draft up a statement.  Thomas you and I need to talk about how to message that properly."  The same day, KARONY and defendant THOMAS SMITH discussed whether to disclose to investors their control and intended use of tokens in the SFM liquidity pool. KARONY thus suggested that they could update the SafeMoon white paper "and call it a day."

43.     Although the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH internally discussed their ability and intent to use funds from the SFM liquidity pool, they did not disclose those facts to SFM investors.  Rather, through the SafeMoon websites, white papers, social media posts and AMAs, they continued to represent that the SFM liquidity pools were locked and that the funds contained therein were inaccessible to them.  For example, on or about March 17, 2021, as SMITH responded to publicly posted concerns about insider access to the SFM liquidity pool, KARONY messaged SMITH, "make sure you specify we wont [sic] touch the LP."  During a subsequent AMA, SMITH and NAGY were asked about "claims that there is nothing stopping the Dev[eloper]s from accessing the initial liquidity they created." In response, SMITH stated that the SFM liquidity was "locked" and that "over time we generate

more LP tokens that will also be locked," but that they may use SFM LP tokens for "charity and stuff."

      D.     April 2021: The Defendants Removed Additional Liquidity from the SFM
             Liquidity Pools and Secretly Traded SFM for Their Personal Benefit

      44.     By early April 2021, hundreds of thousands of investors held SFM, and its trading volume and price increased dramatically. On April 4, 2021, SFM recorded its then-highest daily trading volume of approximately $43.96 million. That day, the defendants JOHN KARONY and THOMAS SMITH participated in a SafeMoon AMA where they touted the growing number of SFM holders, addressed public comments that SafeMoon was a fraudulent "rug pull" and answered questions about their personal ownership and trading of SFM.

      45.     During the April 4, 2021 AMA, the defendant THOMAS SMITH told investors that SafeMoon was "not a rug pull" or a "soft rug pull." As to his personal SFM holdings, SMITH stated, "I personally hold none because I'm a software engineer. I don't want to, um, I don't want to create a situation where my decisions as a CTO are affected by the monetary gain of those actions, and that's why I've made that separation for myself." During the AMA, SMITH further explained that he did not hold SFM tokens because "not everything is about money guys, it's that simple. I'm not—I'm not greedy. I already get paid. So, I get paid enough that I'm fine. I don't—You know, we're good. I like to earn my money. I like to, you know, feel good about what I've done." Thereafter, users on SafeMoon's social media pages repeated SMITH's claim that he owned no SFM tokens.

      46.     After the conclusion of the April 4, 2021 AMA, in the overnight hours of April 5, 2021, the defendant KYLE NAGY transferred 513 billion SFM to a wallet address owned and controlled by defendant THOMAS SMITH. The SFM that NAGY transferred to

SMITH was traceable to the SFM liquidity pool and was valued at more than $600,000 at the time.

47.     After receiving the SFM from the defendant KYLE NAGY, the defendant THOMAS SMITH sold large quantities of that SFM, swapping SFM for a more widely used digital asset and then sending it to an account SMITH controlled at Crypto Exchange 1, a centralized digital asset exchange the identity of which is known to the Grand Jury. During that time, SMITH communicated about these SFM sales with Co-Conspirator 1, who was a SafeMoon "Community Manager" in charge of monitoring SafeMoon's social media platforms and chat rooms. After SMITH successfully transferred the SFM sale proceeds, SMITH told Co-Conspirator 1, "BRO WE DID IT" and "ITS F[*****]G GO TIME," and they discussed buying luxury vehicles. After completing additional sales of SFM that day, SMITH told Co-Conspirator 1 that "basically nobody noticed" SMITH's sales of SFM.

48.     The same day, April 5, 2021, the defendant KYLE NAGY used SFM LP tokens to remove 66 trillion SFM and 272 BNB tokens from the SFM liquidity pool. Minutes later, NAGY transferred all 272 BNB to a wallet he controlled. Over the next two weeks, NAGY sold trillions of SFM and BNB traceable to the SFM liquidity pool for more than $7 million worth of stablecoins and other digital assets, which he transferred to wallets addresses he owned and controlled.

49.     On or about April 9, 2021, the defendant KYLE NAGY messaged the defendant THOMAS SMITH concerning the SFM liquidity pool and told SMITH that "Upon calculation, 5 [trillion] Safemoon is left over from pulling out of the LP." SMITH asked NAGY, "We pulled from the lp?" and NAGY stated, "Initial LP was locked. I pulled from the generating LP yes," and he told SMITH, "call me."

E.    Public Scrutiny of the SFM Liquidity Pools Increased and the Defendants
      Continued to Fraudulently Remove Liquidity from the SFM Liquidity Pool

50.    On or about April 20, 2021, a social media account with a large following posted a "scam alert" concerning SFM, claiming that the owners of the SFM smart contract "could pull LP and sell tokens, creating a rug pull." The post was widely distributed across SafeMoon's social media platforms and chat rooms. The same day, Co-Conspirator 1 messaged the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH to inform them that current and prospective SFM investors were "flipping the f[***] out about the [Social Media Account 1's] post." NAGY sent KARONY a link to the post and wrote, "crash incoming."

51.    On or about April 21, 2021, the defendant JOHN KARONY posted a series of messages on social media responding to the claims and calling the original social media post, "FAKE NEWS." In his posts, the defendant JOHN KARONY disclosed that the liquidity generated with each SFM transaction was not automatically locked but, instead, the liquidity locking was "automated"—a claim contrary to statements previously made on SafeMoon's websites and social media pages. In his posts, KARONY also disclosed for the first time that SafeMoon—including the defendants KYLE NAGY and THOMAS SMITH—retained access to the SafeMoon liquidity pool and would use liquidity from the pool as a "last resort" to provide SFM to digital-asset exchanges, also known as "seeding," and for "development costs of future SafeMoon innovations." KARONY represented that SafeMoon "will publicly go to the Community and let you know if the LP will be used and what for, ahead of time."

52.    The defendants JOHN KARONY and THOMAS SMITH also led an AMA on April 21, 2021 where they addressed the claims made about their access to the SFM liquidity pool and the risk of SafeMoon insiders executing a "rug pull" to defraud investors.

During the AMA, KARONY and SMITH made the following misrepresentations to SFM

investors:

KARONY: [W]e understand that situations may require the use of the LP. Uses can include seeding other exchanges creating more backbones as well as in the last resort for development costs. But that is only—honestly, we haven't had a need, and we don't foresee a need, you know, in the future. So, if you watched our other AMAs, you would have known, uh, that the LP is a last resort, and we have publicly— Sorry. Basically, I'm gonna sum it up. I'm not gonna read the rest of these tweets. Um, basically if we are gonna do something with the LP we'll tell you even if it includes locking it away we usually do about once a week but we let you know when we do it. Thomas.

\* \* \*

SMITH: Of course, we got a lot of LP tokens. And look what we did: we locked them. Again and again and again and we're going to keep doing it. And then as John was saying, if something comes up that makes sense, we're going to tell you, and then we're going to, you know, judge our reaction based off of your reaction. It's a— it's a perfect symbiosis of the community and what we're doing. It's awesome.

53.     Contrary to the defendants JOHN KARONY's and THOMAS SMITH's

representations on April 21, 2021 concerning the SFM liquidity pool, KARONY, SMITH and

defendant KYLE NAGY continued to remove millions of dollars' worth of liquidity from the

SFM liquidity pool and to secretly divert some of those funds for their own personal benefit.

54.     On or about and between May 6, 2021 and September 2, 2021, the

defendant THOMAS SMITH used a wallet address he owned and controlled ("SMITH

Wallet 1") to remove liquidity from the SFM liquidity pool on at least 18 occasions. Through

those 18 liquidity removals, SMITH removed approximately 13.4 trillion SFM tokens worth

more than $70 million at the time and approximately 160,894 BNB tokens worth more than $80

million at the time. SMITH transferred a large portion of those tokens to digital-asset exchanges

for SafeMoon business that was, in part, disclosed to SFM investors. Of the tokens SMITH

removed from the SFM liquidity pool using SMITH Wallet 1, however, he transferred at least

4,659 BNB, worth more than $1.5 million at the time, and 194 billion SFM, worth more than $570,000 at the time, to other wallet addresses he owned and controlled.

55. On or about and between May 7, 2021 and May 8, 2021, the defendant THOMAS SMITH used a second wallet address he owned and controlled ("SMITH Wallet 2") to remove liquidity from the SFM liquidity pool; specifically, he removed 557 BNB, worth more than $350,000 at the time, and 4.9 billion SFM, worth more than $250,000 at the time. SMITH thereafter sold those SFM tokens, together with other SFM tokens he received from the defendant KYLE NAGY, for additional BNB tokens worth more than $1.7 million at the time. SMITH used those BNB tokens to, among other things, buy luxury sports cars and make personal investments.

F. The Defendants Misappropriated Tokens Intended for the SFM Liquidity Pool

56. In addition to fraudulently removing tokens directly from the SFM liquidity pools, the defendants JOHN KARONY and THOMAS SMITH, together with others, also misappropriated tokens that were intended to be manually added to the SFM liquidity pool.

57. Shortly after SafeMoon's launch and continuing thereafter, the defendants JOHN KARONY, KYLE NAGY and THOMAS SMITH successfully listed SFM with Crypto Exchange 2, a centralized digital-asset exchange the identity of which is known to the Grand Jury. As a centralized exchange, trading of SFM at Crypto Exchange 2—as opposed to transfers of SFM over the blockchain—would not benefit from SFM's reflections and liquidity pool additions, unless SafeMoon manually provided those investors with reflections and liquidity pool additions.

58. The defendants JOHN KARONY and THOMAS SMITH worked with Crypto Exchange 2 to provide those benefits to its customers. Pursuant to agreements executed in or about April 2021, SafeMoon agreed to provide Crypto Exchange 2 with SFM to be

distributed as "reflections" on Crypto Exchange 2. As to liquidity pool additions, Crypto

Exchange 2 agreed to send specific quantities of stablecoins to SafeMoon that were intended to

be swapped for SFM and deposited into the SFM liquidity pool. KARONY, SMITH and others

marketed these features to current and prospective investors.

59.     Between April 23, 2021 and May 21, 2021, a wallet address owned and

controlled by defendant JOHN KARONY received more than $8 million in stablecoins from

Crypto Exchange 2. These stablecoins were supposed to be swapped for SFM and deposited into

the SFM liquidity pool. KARONY and the defendant THOMAS SMITH, however, diverted a

portion of these stablecoins into a digital-asset exchange account owned and controlled by

SMITH. On or about July 1, 2021, a wallet address owned and controlled by KARONY sent

SMITH approximately $1.5 million worth of the stablecoins from Crypto Exchange 2. In turn,

SMITH withdrew $1.4 million in fiat currency to a bank account and transferred those funds to

KARONY's personal bank account.

COUNT ONE
(Securities Fraud Conspiracy)

60.     The allegations contained in paragraphs one through 59 are realleged and

incorporated as if fully set forth in this paragraph.

61.     In or about and between March 2021 and June 2022, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants BRADEN JOHN KARONY, also known as "John Karony" and

"CPT_HODL_T_MUN," KYLE NAGY, also known as "SafeMoon Dev," and THOMAS

SMITH, also known as "papa," together with others, did knowingly and willfully conspire to use

and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the

Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code

of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the digital token SFM, in connection with the purchase and sale of SFM, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

62.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants BRADEN JOHN KARONY, KYLE NAGY and THOMAS SMITH, together with others, did commit and cause the commission of, among others, the following:

## OVERT ACTS

(a)     On or about and between March 5, 2021 and April 5, 2021, NAGY caused 3,811 SFM LP tokens to be sent to the SFM LP liquidity pool and removed approximately 83 trillion SFM and 921 BNB tokens from the SFM liquidity pool.

(b)     On or about and between March 6, 2021 and April 5, 2021, NAGY transferred approximately 10.7 trillion SFM and 710 BNB tokens traceable to the SFM liquidity pool, to wallet addresses owned and controlled by NAGY.

(c)     On or about March 30, 2021, KARONY executed an agreement on behalf of SafeMoon with Crypto Exchange 2 to list SFM as a token available to trade on Crypto Exchange 2 and represented, among other things, that 5% of a trading fee to be applied to SFM

trades on Crypto Exchange 2 would be "returned to [SafeMoon] to be added back to the liquidity pool for SafeMoon tokens on [Crypto Exchange 2]."

      (d)     On or about April 4, 2021, during an AMA broadcasted to investors in the Eastern District of New York and elsewhere, SMITH told SFM investors that "I personally hold none [i.e., SFM] because I'm a software engineer."

      (e)     On or about April 5, 2021, NAGY transferred 513 billion of SFM traceable to the SFM liquidity pool to a wallet address at Crypto Exchange 1 owned and controlled by SMITH.

      (f)     On or about April 5, 2021, SMITH sold at Crypto Exchange 1 SFM, which he had received from NAGY and which was traceable to the SFM liquidity pool, and used the proceeds to buy another digital asset.

      (g)     On or about April 8, 2021, KARONY instructed SMITH to exclude a wallet address ending in "6abe" from the automatic SFM 10% tax and stated, "This is my wallet . . . well the other wallet."

      (h)     On or about April 20, 2021, KARONY stated to investors on a social media platform, "10% tax. 5% to holders, 5% to LP.  The 5% LP is Split, 2.5% goes to locked LP, and the other 2.5% is manually locked or left alone if needed for dev costs or to SEED DEXS AND EXCHANGES."

      (i)     On or about April 21, 2021, KARONY posted to a social media platform concerning the SFM liquidity pool and stated, "THE LP LOCK IS NOT AUTOMATIC BUT AUTOMATED.  AUTOMATED AND AUTOMATIC ARE NOT THE SAME THING. THIS IS DONE FOR BOTH SECURITY AND LONGEVITY OF #SAFEMOON."

(j)     On or about April 21, 2021, KARONY posted to a social media platform concerning the SFM liquidity pool and stated, "THE LP IS A LAST RESORT, AND WE WILL PUBLICLY GO TO THE COMMUNITY AND LET YOU KNOW IF THE LP WILL BE USED AND WHAT FOR, AHEAD OF TIME. #SAFEMOON."

(k)     On or about April 21, 2021, KARONY posted to a social media platform concerning the SFM liquidity pool and stated, "SITUATIONS ARISE WHICH MAY REQUIRE THE USE OF THE LP. USES INCLUDE: SEEDING OTHER EXCHANGES AND DEX'S, DEVELOPMENT COSTS OF FUTURE SAFEMOON INNOVATIONS."

(l)     On or about April 21, 2021, during an AMA broadcast to investors in the Eastern District of New York and elsewhere, KARONY stated that there were "situations [that] may require the use of the LP.  Uses can include seeding other exchanges creating more backbones as well as in the last resort for development costs.  But that is only—Honestly, we haven't had a need, and we don't foresee a need, you know, in the future."

(m)     On or about and between March 13, 2021 and April 24, 2021, a cryptocurrency address controlled by NAGY sold more than approximately 2.84 trillion SFM for $7.6 million worth of a stablecoin.

(n)     On or about May 7, 2021, SMITH redeemed SFM LP tokens and removed approximately 3.4 billion SFM and 50 BNB from the SFM liquidity pool, a portion of which SMITH transferred and sold using accounts SMITH personally controlled at multiple centralized exchanges.

(o)     On or about May 8, 2021, SMITH redeemed SFM LP tokens and removed approximately 31.8 billion SFM and 507 BNB from the SFM liquidity pool, a portion

of which SMITH transferred and sold using accounts SMITH personally controlled at multiple centralized exchanges.

(p)     On or about May 13, 2021, KARONY and SMITH, together with others, directed Crypto Exchange 2 to transfer approximately $8,542,217 worth of stablecoins to an address they controlled at Crypto Exchange 2, which stablecoins were to be added to the SFM liquidity pool pursuant to the contract between SafeMoon and Crypto Exchange 2.

(q)     On or about June 2, 2021, SMITH used a cryptocurrency address he had excluded from SafeMoon's 10% tax to sell approximately 194,868,236,117 SFM for 1,931.815343 BNB and thereafter transferred those proceeds to accounts SMITH personally controlled at multiple centralized exchanges and swapped them for other digital assets and stablecoins.

(r)     On or about June 17, 2021, SMITH transferred $150,007 worth of a stablecoin from a centralized cryptocurrency exchange to a third party with the note "for car."

(s)     On or about July 1, 2021, KARONY transferred approximately $1.5 million worth of stablecoins received from Crypto Exchange 2 to another centralized exchange account owned and controlled by SMITH.

(t)     On or about July 1, 2021, SMITH sold approximately $1.4 million worth of stablecoins he received from KARONY in a centralized exchange account he controlled, transferred the proceeds to a bank account he controlled and then wired those funds to a bank account controlled by KARONY.

(u)     On or about July 7, 2021, SMITH redeemed SFM LP tokens and removed approximately 1.01 trillion SFM and 9,732.22 BNB from the SFM liquidity pool.

        (v)     On or about July 23, 2021, SMITH, using cryptocurrency addresses he controlled, sent 2,900 BNB worth more than approximately $860,000 and traceable to the SFM liquidity pool to a third party's cryptocurrency address to purchase a custom Porsche 911 sportscar and non-fungible token.

        (Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
### (Wire Fraud Conspiracy)

        63.     The allegations contained in paragraphs one through 59 are realleged and incorporated as if fully set forth in this paragraph.

        64.     In or about and between March 2021 and June 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRADEN JOHN KARONY, also known as "John Karony" and "CPT_HODL_T_MUN," KYLE NAGY, also known as "SafeMoon Dev," and THOMAS SMITH, also known as "papa," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud current and prospective investors in SFM, a digital token, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

        (Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT THREE
### (Money Laundering Conspiracy)

        65.     The allegations contained in paragraphs one through 59 are realleged and incorporated as if fully set forth in this paragraph.

66.     In or about and between March 2021 and June 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRADEN JOHN KARONY, also known as "John Karony" and "CPT_HODL_T_MUN," KYLE NAGY, also known as "SafeMoon Dev," and THOMAS SMITH, also known as "papa," together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions in fact involved the proceeds of specified unlawful activity, to wit: one or more offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, § 77a et seq., and wire fraud, in violation of Title 18, United States Code, Section 1346, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity and (a) knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and (b) to avoid one or more transaction reporting requirements under Federal law, to wit: Title 31, United States Code, Section 5313(a), contrary to Title 18, United States Code, Section 1956(a)(1)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

67.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly

as a result of such offenses including but not limited to the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at:

        (a)    240 Valley View Lane, Bethlehem, New Hampshire, 03574, and all proceeds traceable thereto;

        (b)    1022 W 2200 N, Pleasant Grove, Utah, 84062, and all proceeds traceable thereto; and

        (c)    7700 Hidden Hammock Lane, Vero Beach, Florida, 32966, and all proceeds traceable thereto.

        68.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_Mary Beth Glickman_
FOREPERSON

_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2021R00923

FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

BRADEN JOHN KARONY, KYLE NAGY AND THOMAS SMITH,

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 1349, 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

*Mary Beth Glickman* _ _ _ _ _ _ _ _ _
*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

**Drew G. Rolle, Matthew R. Galeotti and John O. Enright, Assistant U.S. Attorneys (718) 254-7000**

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
*   OCTOBER 31, 2023     *
BROOKLYN OFFICE

# INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

23-CR-433
Judge Eric R. Komitee
Magistrate Judge  Cheryl L. Pollak

1.    Title of Case: <u>United States v. Braden John Karony</u>

2.    Related Magistrate Docket Number(s): _____

3.    Arrest Date: <u>  N/A</u>

4.    Nature of offense(s):   ☒  Felony
                                ☐  Misdemeanor

5.    Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local E.D.N.Y. Division of Business Rules): _____

6.    Projected Length of Trial:   Less than 6 weeks    ☒
                                        More than 6 weeks   ☐

7.    County in which crime was allegedly committed: <u>Kings </u>
    (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.    Was any aspect of the investigation, inquiry and prosecution giving rise to the case pending or initiated before March 10, 2012.[1]   ☐ Yes  ☒ No

9.    Has this indictment/information been ordered sealed?   ☒ Yes ☐ No

10.   Have arrest warrants been ordered?   ☒ Yes ☐ No

11.   Is there a capital count included in the indictment?  ☐ Yes ☒ No

BREON PEACE
United States Attorney

By: _____

Drew G. Rolle
Matthew R. Galeotti
John O. Enright
Assistant U.S. Attorneys
(718) 254-7000

---

[1]    Judge Brodie will not accept cases that were initiated before March 10, 2012.

Rev. 10/04/12